561 F.2d 753
 77-2 USTC P 9685
 John D. GRAY and Elizabeth N. Gray, John R. Gray, First
National Bank of Oregon, Guardian, Joan E. Gray, First
National Bank of Oregon, Guardian, Janet L. Gray, First
National Bank of Oregon, Guardian, Laurie J. Gray, First
National Bank of Oregon, Guardian, Anne L. Gray, First
National Bank of Oregon, Guardian, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 Nos. 75-1041 to 75-1046.
 United States Court of Appeals,
Ninth Circuit.
 Sept. 21, 1977.
 
 Michael Waris, Jr., Washington, D. C., argued, for petitioners-appellants.
 Stephen M. Gelber, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., argued, for respondent-appellee.
 Appeals from Decisions of the United States Tax Court.
 Before GOODWIN and SNEED, Circuit Judges, and BLUMENFELD,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 Taxpayers appeal from a decision of the Tax Court holding that what in form was a sale of taxpayers' stock in a wholly owned corporation was in substance a liquidation of the corporation. John D. Gray, 56 T.C. 1032 (1971). The case demonstrates anew the need to elevate substance over form in interpreting a sophisticated code of tax laws where slight differences in a transaction's design can lead to widely divergent tax results. It also demonstrates, however, the difficulties in determining the substance of a transaction when dealing with complex business arrangements in which the items of commerce frequently are legal abstractions such as corporate entities and shares.
 
 
 2
 The present transaction has at least five plausible characterizations, all with substantially different tax results. According to their theory, taxpayers sold their shares in a wholly owned corporation, containing only cash and preferred stock in another of taxpayers' corporations, to an unrelated party in an arm's-length transaction; the preferred stock was then redeemed from the corporation after the sale was completed and, thus, after taxpayers' control over the redeeming corporation could no longer be attributed to the sold corporation through section 318 of the Internal Revenue Code (hereinafter Code).[1] The Tax Court, however, focusing on the purported sale, held that taxpayers had in substance liquidated the corporation following which the preferred stock was redeemed directly from the hands of the taxpayers. We take a third position. We accept the sale format in which taxpayers chose to cast their transaction. At the same time, however, we believe that the redemption of the preferred occurred before rather than after the sale was effectuated.
 
 I.
 
 3
 THE FACTS.
 
 
 4
 In 1960, taxpayers John D. Gray and family were the principal shareholders of two corporations profitably engaged in the manufacture and sale of saw chains both here and abroad. Domestic operations were centered in Omark Industries Inc. (hereinafter Omark), of whose stock all but about 10 percent was held by taxpayers. Foreign sales were handled by Omark Industries (1959), Ltd. (hereinafter Omark 1959), a Canadian corporation owned entirely by taxpayers. In an effort both to prepare Omark for an eventual public offering and to avoid disputes with the minority shareholders of Omark, taxpayers in late 1960 decided to realign the Omark-Omark 1959 relationship into that of parent-subsidiary. This was accomplished by Omark forming a Canadian subsidiary, Omark Industries (1960) Ltd. (hereinafter Omark 1960), and having the subsidiary acquire the assets of Omark 1959 and assume its liabilities. Omark 1959 in exchange received $10,000 in cash, a $82,604 line of credit, and 15,000 shares of Omark 1960 $100-par, non-cumulative preferred. The name of Omark 1959 was then changed to Yarg, Ltd. (hereinafter Yarg).[2]
 
 
 5
 Following the acquisition of Yarg's assets by Omark 1960, taxpayers attempted to convert Yarg into a real estate investment corporation. Gray actively investigated a variety of real estate investments during 1961 and 1962. Gray's efforts to find suitable investments, however, were unsuccessful. While Yarg did make a series of investments in Oregon corporations, no real estate was ever purchased.
 
 
 6
 By 1962, several factors had convinced taxpayers to terminate their ownership of Yarg as expeditiously as possible. Because of the failure to find satisfactory real estate investments for Yarg, the IRS was likely to classify Yarg as a foreign personal holding company subject to sections 551 et seq. of the Code.[3] Under the foreign personal holding company provisions, taxpayers would be taxed at ordinary income rates on any undistributed investment earnings of Yarg.[4] To make matters worse, legislation had been introduced into Congress which, if passed, would tax as dividend income any gain recognized on the liquidation of a controlled foreign corporation such as Yarg.[5]
 
 
 7
 Taxpayers considered a variety of means for terminating their interest in Yarg including transferring their stock in Yarg to Omark in exchange for Omark stock in a nontaxable section 351 transaction, contributing the Yarg stock to a capital exchange fund, and liquidating Yarg. Each of those alternatives, however, had distinct disadvantages and taxpayers ultimately decided to sell their stock in Yarg to an outside buyer. Although two investment banking firms were commissioned to find a buyer, it was Gray's attorney who ultimately located a purchaser. Frank H. Cameron (hereinafter Cameron), a Canadian businessman, offered to purchase the Yarg stock for "net book value less 41/2 percent of undistributed income"; he insisted, however, that prior to purchase, all of Yarg's assets be reduced to cash and Yarg's liabilities be reduced to only capital and surplus.
 
 
 8
 At this point, Yarg's assets consisted of a small amount of cash, minor investments in three Oregon corporations, and the 15,000 shares of Omark 1960 preferred. In line with the all-cash requirement in Cameron's offer, Gray purchased Yarg's Oregon investments at book value in cash. However, taxpayers balked at reducing the Omark 1960 preferred to cash prior to the sale. Cameron's insistence on cash was understandable. There was no guarantee that the Omark 1960 preferred would be redeemed in the near future. And, while the book value and redemption price of the Omark 1960 preferred was $1,500,000, its fair market value was considerably less, taxpayers once in the course of this litigation having stipulated a value of only $1,000,000. From taxpayers' standpoint, however, a redemption of the Omark 1960 preferred prior to the sale of the Yarg stock would lead to foreign personal holding company income, taxable to Gray and his family as ordinary income.[6] Ultimately, it was agreed between the parties that Cameron would purchase the Yarg stock while Yarg still held the Omark 1960 preferred, but that the purchase would be subject to a condition subsequent negating the transaction if the Omark 1960 preferred was not redeemed within six days after the purchase. Cameron would be free to waive the condition subsequent if he wished. To ensure that Omark 1960 would be able to redeem the preferred shares, Gray arranged for Omark and another Omark subsidiary to lend approximately $1.3 million to Omark 1960 four days prior to the planned sale.
 
 
 9
 On September 21, 1962, Cameron, acting through two wholly owned Canadian corporations, gave two certified checks totalling $1,681,400 to personal representatives of taxpayers in exchange for all the outstanding Yarg stock. The checks, the Yarg stock, the Yarg corporate records and the Omark 1960 preferred stock, all properly endorsed, were then placed in escrow with the Bank of Montreal. By the terms of the escrow, the Bank was to return the checks to Cameron and the other excrow items to taxpayers if the Omark 1960 preferred had not been redeemed by September 26, 1962 and Cameron had not waived the condition. On September 22, with Cameron and two associates purportedly installed as Yarg's new directors, Yarg requested that Omark 1960 redeem its preferred stock; the request was made by means of a letter previously drafted by Gray's Canadian attorney. The stock was redeemed on September 25, 1962, and the escrow was closed.
 
 
 10
 Taxpayers treated the 1962 transaction as a sale of the Yarg stock, reporting their profit on the transaction as capital gains. The Commissioner assessed deficiencies against taxpayers contending that the transaction was in reality a constructive dividend to taxpayers of the assets of Yarg followed by a second constructive dividend on the redemption of the Omark 1960 preferred; both dividends would be taxable at ordinary income rates.[7] The Tax Court held that both characterizations were wrong. According to the Tax Court, the 1962 dealings constituted a constructive liquidation of Yarg on September 21 followed by a redemption of the Omark 1960 stock from the hands of taxpayers on September 25.
 
 II.
 
 11
 ANALYSIS.
 
 
 12
 We agree with the Tax Court that the taxpayers' characterization of the transaction must be rejected. We believe that the controlling issues are when and from whom the redemption was made, however, and not whether the taxpayers liquidated or sold their stock.
 
 
 13
 Assuming that taxpayers are correct in characterizing their transaction as a sale rather than a liquidation, the facts indicate that the substance of the sale followed rather than preceded the redemption of the 1960 preferred. The fact that the agreement was cast in the form of a sale subject to condition subsequent, which may be considered a completed sale under Canadian law, is irrelevant for purposes of federal taxation. We must look to the relevant concepts of federal tax law to determine when the sale occurred. Commissioner v. Tower, 327 U.S. 280, 287-88, 66 S.Ct. 532, 90 L.Ed. 670 (1946); Hudspeth v. United States, 471 F.2d 275, 277 (8th Cir. 1972); Estate of Starr v. Commissioner, 274 F.2d 294, 294-95 (9th Cir. 1959). For tax purposes, sale is essentially an economic rather than a formal concept. Our task is to examine all of the factors to determine the point at which the burdens and benefits of ownership were transferred.
 
 
 14
 It is settled that when a person agrees to sell property subject to certain conditions, and the property is placed in escrow until those conditions are fulfilled, no sale occurs until those conditions have been fulfilled. Dyke v. Commissioner, 6 T.C. 1134 (1946); see Texon Oil & Land Co. v. United States, 115 F.2d 647 (5th Cir. 1940); Big Lake Oil Co. v. Commissioner, 95 F.2d 573 (3d Cir. 1938). Here, the Yarg stock was placed in escrow, subject to the condition that the "sale" would be undone if the redemption did not occur.[8] Completion of the transaction was subject to real contingencies; the seller was not free to demand his proceeds until the redemption occurred, Carpenter v. Commissioner, 34 T.C. 408, 409, 414 (1960).
 
 
 15
 Buttressing our conclusion that the sale was not completed until the redemption occurred is the fact that the condition imposed was not insignificant or remote; rather, the redemption supplied the economic substance needed to complete the sale. The purchase price of the Yarg stock was computed by adding to Yarg's cash assets a sum of $1.5 million attributable to the Omark 1960 preferred. But the preferred would be worth that amount only upon redemption. Its value in the absence of redemption was considerably less.[9] If the Omark 1960 preferred were redeemed, the escrow would be closed and the sale completed. If the preferred were not redeemed, Cameron would be free to abandon the sale, and would have no economic incentive to do otherwise. See generally Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976). The stubborn fact is that without the redemption there would have been no sale.
 
 
 16
 The facts also demonstrate that it was Gray, through Yarg, who initiated and received the benefits from the redemption of the Omark 1960 preferred. The only reason suggested in the record why Omark 1960 chose to redeem its preferred on September 25, 1962 was that it was necessary to effectuate taxpayers' sale of the Yarg stock. Gray was in complete constructive control of Omark 1960. It was Gray who arranged the financing for the redemption. It was even Gray's attorney who drafted the letter requesting the redemption. As for the proceeds of the redemption, the sales price of the Yarg stock reflected these proceeds. Taxpayers received the redemption value of the preferred rather than its fair market value. Thus, it was taxpayers, not Cameron, who received the economic benefit from the redemption of the Omark 1960 preferred. To hold that the preferred was only redeemed after the Yarg stock was sold and taxpayers' relationship with the corporation ended would ignore how and why the redemption was made. Such a holding would also defeat Congress' purpose in passing sections 301, 302, 316 and 318 of the Code, taxing as ordinary income redemptions that are essentially equivalent to a dividend, even when they are only indirectly made to a shareholder through a related entity.[10] Cf. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders P 10.07, at 10-13 to 10-14 (1971).
 
 
 17
 The Tax Court's characterization of the 1962 transaction as in substance a liquidation followed by a redemption suffers from the same defect as does the taxpayers' theory. Under the Tax Court's theory, the September 21, 1962 "sale" was a "liquidation." But this "liquidation," like the "sale," was contingent on the redemption of the Omark 1960 preferred. If the redemption had not occurred, Yarg's cash assets and the Omark 1960 preferred would have remained in corporate solution. Thus, what the Tax Court viewed as the liquidation was contingent on the redemption. Such a contingency is inconsistent with the premise that a liquidation was then and there completed. Until the assets of a corporation have been irrevocably removed from their corporate solution, a complete liquidation has not occurred.
 
 
 18
 Turning to the issue of who received the redemption, the Tax Court's theory holds that the Omark 1960 preferred was redeemed from the hands of taxpayers rather than Yarg. The facts indicate to the contrary. The redemption was from Yarg. The preferred was at all times registered to Yarg prior to the preferred's redemption on September 25; the usual powers of ownership were vested entirely in Yarg; taxpayers would not have been free to sell or pledge the preferred. Furthermore, the redemption proceeds were paid directly to Yarg. While the proceeds ultimately flowed to taxpayers, they took the form of sale proceeds from the transaction with Cameron. Of course, the Tax Court would have been free to reject the form of the redemption if tax substance so dictated.[11] But it does not. Under sections 302 and 318 of the Code, if a redemption that would be essentially equivalent to a dividend in the hands of the taxpayers is received instead by a wholly owned corporation, the redemption is still taxed as a dividend but to the corporation. Congress was free in drafting these provisions to tax the redemption directly to the taxpayers, but it purposefully did not. The tax court was not free, under the instant circumstances, to reject corporate separateness when Congress has chosen to preserve it.[12] It matters not whether the Tax Court's conclusion that the taxpayers received the redemption be regarded as a mistake of law or an erroneous finding of fact. If it is the former, which we believe it to be, it is our duty to correct it;[13] if it is the latter, we hold it not only erroneous but clearly so.[14]
 
 
 19
 Therefore, there was a redemption of the Omark 1960 preferred from the hands of Yarg followed by what appears in form to have been a sale of the Yarg stock to Cameron. There is no reason to reject the sale form in favor of a liquidation theory. By selling their stock to Cameron, taxpayers have incurred a higher tax than if, following the redemption of the Omark 1960 preferred, they had liquidated Yarg.[15] Having cast the transaction in the form of a sale, however, taxpayers cannot now be heard to complain. See Commissioner v. National Alfalfa Dehydrating, 417 U.S. 134, 149, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974); Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940).
 
 
 20
 We, therefore, remand to the Tax Court for further proceedings in line with this court's determination that there was a redemption of the Omark 1960 preferred followed by a sale of the Yarg stock.
 
 
 21
 REVERSED AND REMANDED.
 
 BLUMENFELD, District Judge (dissenting):
 
 22
 The majority's opinion reveals a perceptive and plausible analysis of the transaction between Gray and Cameron.[1] What is disturbing, however, is the cursory treatment of an issue of dominant interest to a Court of Appeals, namely, the standard of review. That standard is established by 26 U.S.C. § 7482(a):
 
 
 23
 "The United States Court of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury . . . ."
 
 
 24
 And, Rule 52(a), Fed.R.Civ.P., provides in relevant part that "Findings of fact shall not be set aside unless clearly erroneous . . . ." As noted in Estate of Chism v. Commissioner, 322 F.2d 956, 960-61 (9th Cir. 1963):
 
 
 25
 "Tax Court determinations of fact, including factual inferences from undisputed basic facts, may be set aside on appeal only if they are clearly erroneous. Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218."
 
 
 26
 Accord, Rockwell v. Commissioner, 512 F.2d 882, 884 (9th Cir.), cert. denied, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975).
 
 I.
 
 27
 The economic reality of the taxable transaction we are concerned with may be stated quite simply. The taxpayers are a family group, headed by John D. Gray, who owned all the stock of Yarg Corp. After the transaction, the taxpayers had more than 95% of the corporate assets, and Cameron had the Yarg stock. The balance which remained in Yarg was to cover the fee for Cameron's services as agent for the taxpayers (41/2% on the total assets plus less than $1,000 to cover the costs incident to the transaction).[2]
 
 
 28
 The Tax Court found that "though in form there was a purchase and sale in substance the petitioners received the assets of Yarg in a distribution upon liquidation." John D. Gray, 56 T.C. 1032, 1067 (1971). Without any reference to the painstaking findings of the Tax Court, nor the detailed recital of evidence to support those findings, the majority opinion takes a different view of the transaction. Despite the Tax Court's determination that the purported "sale" had no economic reality, the majority states:
 
 
 29
 "We accept the sale format in which the taxpayers chose to cast their transaction."
 
 
 30
 From that adopted premise the following thesis is developed. Since the "sale" could not be completed before the Omark preferred was redeemed, the redemption was from Yarg, followed by a sale. Obviously, the taxpayers would rather have sold the stock in Yarg with the preferred as one of its assets than to have received the preferred in liquidation and have it redeemed from them. Although the preferred had a fair value of only $1,000,000, Gray caused Omark to redeem it at its par of $1,500,000. However, the Tax Court made the determination that "Cameron and Dabne purchased nothing; they rather performed services for a fee . . ." id. at 1068, and that Cameron and Dabne "were merely agents of the petitioners for purposes of the liquidation of Yarg" and also redemption. Id. at 1070.
 
 II.
 
 31
 It is often difficult to make a distinction between what is fact and what is law. See generally Paul, Dobson v. Commissioner: The Strange Ways of Law and Fact, 57 Harv.L.Rev. 753-851 (1944). However, that does not leave us adrift in a wonderland, free to choose which of "at least five plausible characterizations" perceived by the majority we should apply to the transaction at issue. In this case signposts exist, for it has been authoritatively determined that both aspects of the Tax Court's determination, that is, (1) that in economic reality there was no sale, and (2) that the assets of Yarg were received in liquidation, are determinations of fact.
 
 
 32
 As to the first, in Commissioner v. Pope, 239 F.2d 881, 883 (1st Cir. 1957), Circuit Judge Woodbury made the point that the Tax Court's determination of whether or not a transaction is in substance a sale is one of fact and, accordingly, must be tested by a "clearly erroneous" standard of review.
 
 
 33
 "Whether any given transaction on its established facts constitutes in law a 'sale,' or, for instance a 'lease' or perhaps a 'mortgage,' is certainly a question of law. But whether a particular transaction concededly falling within the legal definition of a 'sale' is bogus, a fiction without economic reality, a sham, is with equal certainty a question of fact. Thus, under a principle too well established to require citation of authority, the Tax Court's finding that the sale in question was a genuine transaction having economic reality must stand unless we can say on the record as a whole that the finding is 'clearly erroneous.' This we are not prepared to do."
 
 
 34
 The Tax Court's opinion supports in convincing detail its finding that the Gray-Cameron transaction was not in substance a sale. It found:
 
 
 35
 "In order to place any credence on the petitioners' contentions that the form of the transactions at issue reflects reality one must be able to accept the premise that Cameron and Dabne were more than a strawman, a conduit, an agent of the petitioners. This we cannot do. Cameron and Dabne bought cash encased in a corporate shell. The net effect of their machinations was that they transferred $1,681,400 (Canadian dollars) in cash in exchange for $1,761,397 (Canadian dollars) in cash. Cameron and Dabne purchased nothing; they rather performed services for a fee of $79,997 ($1,761,397 less $1,681,400). Gray attempted to use these investment banking corporations as filters, to separate the elixir of capital gain from the dross of dividend.
 
 
 36
 "In support of this conclusion we note several salient facts."56 T.C. at 1068 (footnotes omitted). These facts, which are fully set out in the Tax Court's opinion and which need not be repeated here, leave no doubt that this finding cannot be viewed as "clearly erroneous."
 
 
 37
 The Tax Court's determination that the transaction was a liquidation is similarly one of fact which can be set aside only if clearly erroneous. See Spangler v. Commissioner, 323 F.2d 913, 916-17 & n.8 (9th Cir. 1963). In United States v. Cumberland Public Service Co., 338 U.S. 451, 454, 70 S.Ct. 280, 281, 94 L.Ed. 251 (1950), the Supreme Court, in commenting on its earlier decision in Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), stated:
 
 
 38
 "The Circuit Court of Appeals took a different view of the evidence. In this Court the Government contended that whether a liquidation distribution was genuine or merely a sham was traditionally a question of fact. We agreed with this contention, and reinstated the Tax Court's findings and judgment."
 
 
 39
 Here too, the sharp insight which permeates the Tax Court's opinion points out that in preparation for the transaction all of the assets of Yarg, except the preferred stock, were disposed of to Gray for cash at book value. Yarg had no outstanding liabilities. Furthermore, the so-called "purchasers" of the Yarg shares had assured the Grays that Yarg would earn no profits until after June 30, 1963. Thus, when the Yarg books and records, together with the Yarg stock, properly endorsed, were delivered and placed in escrow, Yarg was already out of business. Its investment activities had come to an end; it had no employees, it had nothing but cash and the 15,000 shares of Omark preferred. This was on September 21, 1962.
 
 The Tax Court expressly found:
 
 40
 "As of September 21, 1962, the distribution in liquidation was complete. Through his agents, including Cameron and Dabne, Gray obtained complete dominion and control of all the assets of Yarg; at this time composed of cash and the Omark 1960 preferred stock."
 
 
 41
 56 T.C. at 1070.
 
 
 42
 In arriving at its finding that the transaction was a liquidation and not a sale in this case, the Tax Court considered evidence bearing upon several different steps in the transaction. It was appropriate for the Tax Court to determine what the inter sese relationship was among these steps.
 
 
 43
 "Whether an apparently integrated transaction shall be broken up into several separate steps (as the majority was done) and whether what apparently are several steps shall be synthesized into one whole transaction is frequently a necessary determination in deciding tax consequences. Where no statute or regulation controls, the Tax Court's selection of the course to follow is no more reviewable than any other question of fact."
 
 
 44
 Dobson v. Commissioner, 320 U.S. 489, 502, 64 S.Ct. 239, 247, 88 L.Ed. 248 (1943) (footnote omitted).
 
 
 45
 The finding of the Tax Court that the redemption of the Omark preferred was from the petitioners following the liquidation was not clearly erroneous.[3] There is ample support for the Tax Court's finding that at all times ". . . Gray was firmly in control of virtually all events." 56 T.C. at 1073. The Tax Court was not hoodwinked by the attempt to disguise this liquidation as a sale. Can anyone doubt that the preferred (worth only $1,000,000) would never have been redeemed for $1,500,000 if it was not certain that Gray was going to get the money.
 
 III.
 
 46
 It is well established legal doctrine that questions of fact are the private domain of the Tax Court. Our only function "is to decide . . . whether there was substantial evidence before the Board (Tax Court) to support the findings made." Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 736, 79 L.Ed. 1343 (1935). The Tax Court's determination that the $1,500,000 was paid after the corporation was in liquidation, and that Cameron was acting merely as agent to return the preferred to Omark and pay over the money to Gray, cannot be moved from the realm of fact to the realm of law.
 
 
 47
 It is not enough to assert by way of an ex cathedra statement that:
 
 
 48
 "It matters not whether the Tax Court's conclusion that the taxpayers received the redemption be regarded as a mistake of law or an erroneous finding of fact. If it is the former, which we believe it to be, it is our duty to correct it; if it is the latter, we hold it not only erroneous but clearly so."
 
 
 49
 This legerdemainic departure from the facts found by the Tax Court appears to involve a policy of pure pragmatism, an abandonment of all attempt to abide by the legislatively mandated standard of review. The opinion moves far beyond traditional principles to treat as law what should be regarded as fact. However, when measured by the proper standard of review, it is amply clear that there was substantial evidence before the Tax Court to support the findings made, which are therefore not "clearly erroneous."
 
 
 50
 I would affirm the judgment of the Tax Court on Judge Sterrett's opinion, 56 T.C. 1032 (1971). Accordingly, I dissent.
 
 
 
 *
 Hon. M. Joseph Blumenfeld, Senior United States District Judge, for the District of Connecticut, sitting by designation
 
 
 [1]
 Under I.R.C. § 302, if a corporation redeems stock from a shareholder who owns 50 percent or more of the voting power in the corporation both before and after the redemption, the redemption proceeds will typically be treated as a dividend and taxed at ordinary income rates to the shareholder. Under I.R.C. § 318(a)(3)(C), similar treatment will be accorded to the redemption of stock from a corporation whose majority shareholder owns 50 percent or more of the voting power in the redeeming corporation both before and after the redemption. The redemption will be treated as a dividend and taxed as ordinary income to the corporation. In essence, the shareholder and the corporation are treated as the same entity for purposes of deciding whether the redemption should be viewed as equivalent to a dividend
 
 
 [2]
 At trial, the Commissioner argued that Omark 1959 had received less than the fair market value of its assets upon their transfer to Omark 1960, thus resulting in a constructive dividend of the difference to taxpayers. The Tax Court disagreed and the Commissioner has not appealed
 
 
 [3]
 A foreign corporation is defined by I.R.C. § 552(a) as a foreign personal holding company if more than 60 percent of its gross income is "foreign personal holding company income" as defined by I.R.C. § 553. Section 553, in turn, defines foreign personal holding company income as most forms of passive investment income, including rents except when the rents constitute 50 percent or more of the gross income. If Yarg, therefore, had located satisfactory real estate investments and received more than 60 percent of its gross income in the form of rents from those investments, foreign personal holding company status could have been avoided. However, in 1962, Yarg was receiving all of its income from passive investments in Oregon corporations and, therefore, was apparently by definition a foreign personal holding company
 
 
 [4]
 Such investment earnings would include any returns on Yarg's investments in Oregon corporations and any proceeds from the redemption of the Omark 1960 preferred if viewed as equivalent to a dividend. I.R.C. § 553
 
 
 [5]
 The legislation was ultimately enacted in amended form as I.R.C. § 1248
 
 
 [6]
 Under I.R.C. §§ 302 & 318, discussed supra note 1, if the preferred were redeemed from Yarg prior to the sale, the redemption proceeds would be treated as equivalent to a dividend. Dividends, in turn, are included in foreign personal holding company income under I.R.C. § 553(a)(1). See note 4 supra. Finally, under I.R.C. § 551(a), any undistributed foreign personal holding company income must be included in the gross income of the corporation's United States shareholders
 
 
 [7]
 The Commissioner no longer urges the adoption of his characterization of the 1962 transaction but instead supports the Tax Court's interpretation of the events
 
 
 [8]
 Cases in which a sale is completed with buyer receiving proceeds unconditionally, subject to an agreement to repurchase part or all of the property if certain conditions occur later, e. g., William Davey v. Commissioner, 30 B.T.A. 837 (1934), are distinguishable from cases in which proceeds are placed in escrow and never disbursed until the conditions occur. Seller in the former case never has the right to demand the proceeds, Carpenter v. Commissioner, 34 T.C. 408, 409, 414 (1960). "It is the fixation of the rights of the parties which is controlling", Commissioner v. Cleveland Trinidad Paving Co., 62 F.2d 85 (6th Cir. 1932)
 
 
 [9]
 Prior to trial, the parties stipulated that the Omark 1960 preferred had a fair market value of $1,000,000. Taxpayers argue on appeal that the stipulation was only for purposes of resolving an independent issue not on review. The stipulation is absolute on its face. We, therefore, accept it for purposes of this appeal
 
 
 [10]
 See note 1 supra
 
 
 [11]
 The issue is whether the taxpayers have recast merely in form what in substance Congress segregated for special treatment. The taxpayers' transaction may meet the dictionary definition of one tax provision but squarely come within the substance of a different provision; under such circumstances, the substance must win out over the form. See generally Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 266-67, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); Helvering v. F. R. Lazarus Co., 308 U.S. 252, 255, 60 S.Ct. 209, 84 L.Ed. 226 (1939); Helvering v. Gregory, 69 F.2d 809, 811 (2d Cir. 1934), aff'd, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935)
 
 
 [12]
 E. Keith Owens, 64 T.C. 1 (1975), and Estate of Edwin C. Weiskopf, 64 T.C. 78 (1975), aff'd per curiam, 37 A.F.T.R.2d 1427 (1976), cited by the Commissioner in support of the Tax Court's theory, are inapposite. In both those cases the central and only issue was whether there had been a sale or liquidation of taxpayers' corporation. As developed above, the central issue in this case is whether the taxpayers' transaction with Cameron, whether viewed as a sale or liquidation, was completed before or after the redemption of the Omark 1960 preferred. Furthermore, the facts in both of the cited cases fully support the Tax Court's theory that there was a liquidation. In both cases, the corporation was liquidated immediately after the purported sale. In Estate of Weiskopf, the "sales agreement" even provided that the "sale" was contingent on the purchaser obtaining a favorable tax ruling "before the date on which liquidation . . . commences." 64 T.C. at 87-88. In this case, the facts conflict in important respects with the Tax Court's theory. Finally, there were strong policy reasons in both Owens and Estate of Weiskopf for holding that a liquidation, rather than a sale, had occurred. In Owens, taxpayers were attempting to assign the corporate profits to individuals with large unused tax losses. In Estate of Weiskopf, to have held the transaction a sale rather than a liquidation would have been "in complete derogation of section 1248 and its legislative history," providing for the full imposition of United States tax when income earned abroad is repatriated. 64 T.C. at 101. As noted in the text, there is no comparable reason for rejecting the taxpayers' formulation of the instant transaction as a sale
 
 
 [13]
 This court has recognized that when erroneous legal conclusions have been attached to undisputed facts by trial courts it may draw different and correct ones on its own. Wener v. Commissioner, 242 F.2d 938 (9th Cir. 1957). The facts here are not in dispute; it is the legal characterization of those facts which has been the subject of this long dispute. The reverse is true when tax consequences turn on a state of mind. The determination of that state of mind is a question of fact to be overturned on appeal only if clearly erroneous. This is the true teaching of Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1959). See Estate of Franklin v. Commissioner, 544 F.2d 1045, (9th Cir. 1976) n.3; Olk v. United States, 536 F.2d 876 (9th Cir. 1976)
 
 
 [14]
 The "clearly erroneous" standard is not a wall that cannot be breached. It is so breached when, to quote Duberstein, supra, n.13, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." 363 U.S. at 291, 80 S.Ct. at 1200. In this instance, if we must assume that the Tax Court made a finding of fact, we possess the requisite conviction
 
 
 [15]
 As developed earlier, the redemption proceeds received by Yarg would be treated as equivalent to a dividend and included in Yarg's foreign personal holding company income. If undistributed, the amount of the proceeds would be included in the gross income of taxpayers. See note 6 supra. Since taxpayers sold their Yarg stock, the redemption proceeds remained "undistributed" for purposes of the code provisions and taxpayers must be taxed thereon. However, in 1962, section 562(b) of the Code provided that a liquidation was a distribution of the corporation's income. Thus, following a liquidation, there would have been no undistributed foreign personal holding company income and taxpayers would therefore only have been taxed on the liquidation at capital gains rates. See J. Sitrick, Foreign Personal Holding Companies, Tax Management Foreign Income Portfolio No. 103, at A-44 (1965)
 
 
 [1]
 Dabne was Cameron's partner in this transaction. The majority opinion refers to Gray and Cameron as the participants, and so shall I
 
 
 [2]
 The 41/2% fee was not simply calculated from the financial result of the transaction. The majority opinion quotes in part from Cameron's proposal drafted in the office of Gray's lawyer. Enlarging that quote makes this point very clear:
 "This letter will be our undertaking that we will . . . purchase all of the issued shares of a company known as Yarg Ltd. for cash in an amount equal to the net book value less 41/2 percent of undistributed income. . . .
 "Under the terms of an escrow agreement to be drawn, it is understood that we will not be bound to complete the purchase until the Company's assets are shown to be cash and that its only liabilities will be capital and surplus. . . ."
 John D. Gray, 56 T.C. 1032, 1051-52 (1971) (footnote omitted).
 
 
 [3]
 "As further support for our finding of the subservient nature of Cameron's and Dabne's role we note that the letter requesting redemption by Omark 1960 was drafted by Gray's agent. When one purports to sell cash in corporate solution the burden is surely particularly severe on the seller to show that the only purpose served is not tax avoidance
 "Once the fog of Cameron and Dabne is blown away by the fresh air of economic reality the substance of the transactions is clearly visible. On September 26, 1962, the petitioners, collectively, had $1,681,400 (Canadian dollars) in cash . . . . The question now to be answered is how did this cash and these assets come to rest with petitioners.
 "In view of Gray's intent to terminate the petitioners' interest in Yarg the only plausible explanation is that Yarg was liquidated. The petitioners received its assets, and then Omark 1960 redeemed its preferred stock from the petitioners. The term 'liquidation' is not defined by either the Code or the regulations. The question of whether a liquidation has occurred is one of fact. . . . Our conclusion that what purported to be a sale was in fact a liquidation finds considerable support from the fact that, at the conclusion of the various transactions the petitioners had in hand the precise assets formerly held by Yarg although the Omark 1960 preferred stock was to be redeemed for cash, hardly an undesirable exchange. . . . As of September 21, 1962, the distribution in liquidation was complete. Through his agents, including Cameron and Dabne, Gray obtained complete dominion and control of all the assets of Yarg; at this time composed of cash and the Omark 1960 preferred stock."
 
 
 [56]
 T.C. at 1069-70