**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KURT SOLLBERGER,

*Petitioner-Appellant,*

v.

COMMISSIONER OF INTERNAL
REVENUE,

*Respondent-Appellee.*

No. 11-71883

Tax Ct. No.
9458-08

OPINION

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
July 13, 2012—Seattle, Washington

Filed August 16, 2012

Before: Mary M. Schroeder, Andrew J. Kleinfeld, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## COUNSEL

Brian G. Isaacson (argued), Isaacson & Wilson, P.S., Seattle, Washington, for the petitioner-appellant.

Tamara W. Ashford, Kenneth L. Greene, Andrew M. Weiner (argued), United States Department of Justice, Tax Division, Washington, D.C., for the respondent-appellee.

**OPINION**

M. SMITH, Circuit Judge:

Petitioner-Appellant Kurt Sollberger (Sollberger) appeals from a decision of the United States Tax Court (the tax court), which concluded that he owes $128,979 in income tax for the 2004 taxable year. Sollberger entered into an agreement with Optech Limited (Optech) pursuant to which he transferred floating rate notes (FRNs) worth approximately $1 million to Optech in return for a nonrecourse loan of ninety percent of the FRNs' value. The loan agreement gave Optech the right to receive all dividends and interest on the FRNs, and the right to sell the FRNs during the loan term without Sollberger's consent. Instead of holding the FRNs as collateral for the loan, Optech immediately sold the FRNs and, based on the sale price, transferred ninety percent of the proceeds to Sollberger. Sollberger did not report that he had sold the FRNs in his 2004 federal income tax return.

We hold that Sollberger's transaction with Optech constituted a sale for tax purposes, despite its taking the form of a loan, because the burdens and benefits of owning the FRNs were transferred to Optech. *See Gray v. Comm'r*, 561 F.2d 753, 757 (9th Cir. 1977). Accordingly, we affirm the decision of the tax court.

**FACTUAL AND PROCEDURAL BACKGROUND**

Sollberger is president of Swiss Micron, Inc. (Swiss Micron). On June 1, 1999, Swiss Micron adopted the Swiss Micron, Inc. Employee Stock Ownership Plan (the ESOP). On January 1, 2000, Sollberger sold 340 shares of Swiss Micron stock to the ESOP for $1,032,240. Because his original basis in the stock was $47,749, he earned a profit of $984,491. Instead of recognizing the capital gain from the sale of Swiss Micron stock, Sollberger exercised his option under 26 U.S.C. § 1042(a) to defer paying taxes on the profit

by using the stock sale proceeds to purchase FRNs issued by Bank of America, with a face value of $1,000,000.[1]

On July 6, 2004, Sollberger entered into the Master Loan Financing and Security Agreement (the Master Agreement) with Optech.[2] Under the Master Agreement, Optech agreed to loan Sollberger ninety percent of the face value of the FRNs pursuant to the Schedule A-1 Loan Schedule (the Loan Schedule). In return, Sollberger agreed to transfer custody of the FRNs to Optech and give Optech certain rights. The loan was nonrecourse to Sollberger and secured only by the FRNs.[3] Optech was to receive the quarterly interest payments from the FRNs and apply them to the quarterly interest accruing on the loan, with Sollberger being responsible for paying the difference, if any. The loan term was seven years, and Sollberger was not allowed to prepay the principal before the maturity date. Optech agreed to return the FRNs to Sollberger at the end of the loan term if Sollberger had repaid the loan amount in full, in addition to any outstanding net interest, and late penalties due. However, Optech was given the right to sell or otherwise dispose of the FRNs during the loan term, without giving Sollberger notice, or receiving his consent.

On July 9, 2004, Sollberger instructed his bank to transfer the FRNs to a Morgan Keegan & Co. Inc. bank account. Sollberger had previously used the FRNs as collateral for another loan in the amount of $293,274.21, and Bancroft Ventures,

---

[1]FRNs are notes "carrying a variable interest rate that is periodically adjusted within a predetermined range." *See Black's Law Dictionary* 1162 (9th ed. 2009).

[2]When referring to the Optech-Sollberger transaction in this opinion, the word "loan" is used only to describe the transaction's form, not its substance.

[3]A "nonrecourse loan" is a loan in which a lender may seek recovery only against the collateral, not the borrower's personal assets, if the loan is not repaid. See *Black's Law Dictionary* 1020 (9th ed. 2009); *see also Shao v. Comm'r*, 100 T.C.M. (CCH) 182, 2010 WL 3377501, at *2 (2010).

Limited (Bancroft) paid off that loan.[4] Optech acknowledged receipt of the FRNs on July 21, 2004. A few days later, Bancroft sold the FRNs. Optech then informed Sollberger that he would receive a loan in the sum of $900,000, less the $293,274.21 expended by Bancroft to repay the previous loan from a third party to Sollberger, for a total net loan of $606,725.79. Sollberger received the net loan amount on August 2, 2004.

After Sollberger obtained the aggregate funds from Optech, he received quarterly account statements from Optech for the third and fourth quarter of 2004, and for the first quarter of 2005. The statements listed the FRNs as collateral (although they had already been sold) and showed the quarterly interest purportedly earned on the FRNs (which were shown as a credit against the loan interest). Initially, Sollberger paid the difference between the interest accruing under the loan and the interest from the FRNs. After the first quarter of 2005, Sollberger stopped receiving account statements, and he stopped making interest payments.

Sollberger did not report selling the FRNs on his 2004 federal income tax return. The Internal Revenue Service (the IRS) determined that Sollberger sold the FRNs in 2004, earning a long-term capital gain of $852,251 (the amount of the $900,000 loan in the aggregate, less Sollberger's basis of

---

[4]The precise relationship between Bancroft and Optech is unclear. According to the Government, Optech was part of an affiliated group in which Derivium Capital, LLC (Derivium) was the most prominent member. Bancroft and another corporation allegedly provided funding to Derivium. Derivium, Optech, and Bancroft were all allegedly controlled by the owners of Derivium, and were operated as alter egos of one another. *See In re Derivium Capital, LLC*, 437 B.R. 798, 816 (Bankr. D.S.C. 2010) (finding genuine issues of material fact about whether Derivium exercised total dominion and control over Bancroft and Optech). Derivium "eventually went bankrupt and is widely reported to have been a Ponzi scheme." *Shao*, 2010 WL 3377501, at *1. Sollberger agrees that Optech was an affiliate of Derivium.

$47,749). Accordingly, the IRS found that Sollberger owed $128,979 in additional taxes, plus interest.

Sollberger petitioned the tax court to redetermine his deficiency. The tax court granted Respondent-Appellee Commissioner of Internal Revenue's (the Commissioner) motion for summary judgment, and denied Sollberger's motion for partial summary judgment. In prior decisions, the tax court had held that essentially identical transactions between taxpayers and Derivium were sales triggering capital gains rather than loans. *See Shao*, 2010 WL 3377501, at *6; *Calloway v. Comm'r*, 135 T.C. 26, 39 (2010). Applying these precedents, the tax court concluded that Sollberger sold his FRNs to Optech, triggering capital gains in 2004, on which Sollberger owed taxes. After the tax court entered its final decision on April 6, 2011, Sollberger filed a timely notice of appeal, on July 5, 2011.

## STANDARD OF REVIEW AND JURISDICTION

"We review the Tax Court's grant of summary judgment de novo." *Taproot Admin. Servs., Inc. v. Comm'r*, 679 F.3d 1109, 1114 (9th Cir. 2012).

We have jurisdiction pursuant to 26 U.S.C. § 7482(a)(1).

## DISCUSSION

The primary question in this appeal is whether Sollberger's transaction with Optech should be treated as a sale for tax purposes. Although he acknowledges that the transaction took the form of a loan, Sollberger contends that the transaction was neither a sale nor a loan, but a transfer of the FRNs as collateral for a loan, and a theft by Optech of ten percent of their value. The Commissioner disagrees, arguing that the transaction was a sale artfully disguised as a loan.[5] If the

---

[5]Although the Commissioner does not speculate about Sollberger's motive, Sollberger would have received ninety percent of the FRNs' value

transaction was a sale, Sollberger earned capital gains in 2004, on which he owes taxes.

"As an overarching principle, absent specific provisions, the tax consequences of any particular transaction must reflect the economic reality." *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1218 (9th Cir. 2011). "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) (internal quotation marks and citation omitted).

"There is no simple device available to peel away the form of [a] transaction and to reveal its substance." *Id.* at 576. Nevertheless, "[t]echnical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct must not frustrate an examination of the facts in the light of economic realities." *Lazarus v. Comm'r*, 513 F.2d 824, 829 n.9 (9th Cir. 1975) (internal quotation marks and citation omitted).

**[1]** Taxable income includes gains from the sale or other disposition of property. *See* 26 U.S.C. §§ 61(a)(3), 1001(a). The term "sale" is "given its ordinary meaning," which "is a

in cash free of any tax if the transaction had been deemed a loan by the Commissioner, leaving him better off than if he had sold the FRNs for their full market value and paid taxes on the gain. *See Calloway*, 135 T.C. at 38; *see also Comm'r v. Tufts*, 461 U.S. 300, 307 (1983) ("When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer."). Whatever Sollberger understood, "Derivium USA promoted 'the 90% Stock Loan' and other products to people who held appreciated securities with a relatively low basis, promising that the transactions would allow customers to 'monetize' their securities without paying taxes on their capital gains." *United States v. Cathcart*, No. C 07-4762 PJH, 2010 WL 1048829, at *4 (N.D. Cal. Feb. 12, 2010), *adopted*, 2010 WL 807444 (N.D. Cal. Mar. 5, 2010).

transfer of property for a fixed price in money or its equivalent" and "a contract to pass rights of property for money,—which the buyer pays or promises to pay to the seller." *Comm'r v. Brown*, 380 U.S. 563, 571 (1965) (internal quotation marks omitted and alterations in original).

**[2]** "For tax purposes, sale is essentially an economic rather than a formal concept." *Gray*, 561 F.2d at 757. A court's "task is to examine all of the factors to determine the point at which the burdens and benefits of ownership were transferred." *Id.*

We note that the tax court has identified eight relevant criteria it uses to determine whether a sale occurs for tax purposes:

> (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property.

*Grodt & McKay Realty, Inc. v. Comm'r*, 77 T.C. 1221, 1237-38 (1981) (internal citations omitted); *see also Calloway*, 135 T.C. at 33-36 (applying the *Grodt & McKay* factors to determine whether a taxpayer's transaction with Derivium was a sale). Although we agree that these criteria may be relevant in a particular case, we do not regard them as the only indicia of a sale that a court may consider. Creating an exclusive list of factors risks over-formalizing the concept of a "sale," hamstringing a court's effort to discern a transaction's substance

and realities in evaluating tax consequences. *See Frank Lyon*, 435 U.S. at 573; *Lazarus*, 513 F.2d at 829 n.9.

**[3]** To determine whether a sale occurs for tax purposes, we continue to apply a flexible, case-by-case analysis of whether the burdens and benefits of ownership have been transferred. *See Gray*, 561 F.2d at 757.[6] *The Grodt & McKay* factors may provide a useful starting point for analyzing the Sollberger-Optech transaction, but are by no means the end of our inquiry.

**[4]** Here, we have no difficulty concluding that the economic reality of the Optech-Sollberger transaction is that Sollberger sold the FRNs to Optech in return for ninety percent of their face value. The rights given to Optech in the relevant agreements suggest that the transaction was a sale. Although the transaction took the form of a loan, Sollberger transferred the FRNs to Optech, and gave Optech the right to sell the FRNs (which Optech promptly exercised), to transfer the registration of the FRNs into its own name, and to keep all interest due from the FRNs. Sollberger would not be personally liable if he did not make payments on the loan since it was nonrecourse. *See Shao*, 2010 WL 3377501, at *2. Nonrecourse financing, which is sometimes viewed as an "indicator of a sham transaction," *Sacks v. Comm'r*, 69 F.3d 982, 988 (9th Cir. 1995), placed Sollberger more in the position of a seller than a debtor. Nowhere in the Master Agreement or the Loan Schedule did Sollberger promise to repay the money

---

[6]*See also Clodfelter v. Comm'r*, 426 F.2d 1391, 1393-94 (9th Cir. 1970) (stating that "[t]here are no hard and fast rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling; the transaction must be viewed as a whole and in light of realism and practicality" and noting that passage of title, transfer of possession, and whether an unconditional duty to pay arises are all relevant considerations) (citations omitted); *Merrill v. Comm'r*, 336 F.2d 771, 771 (9th Cir. 1964) (affirming on the basis of the tax court's opinion in *Merrill v. Comm'r*, 40 T.C. 66 (1963), which considered when legal title to property had passed and the parties' intent).

"lent" to him. Instead, Optech merely agreed to return the FRNs if Sollberger repaid the loan at the end of the seven-year loan term, thereby giving Sollberger the option of repurchasing the FRNs in seven years, but not requiring him to do so. Thus, the transaction was more akin to an option contract, whereunder the FRNs were sold, but the seller retained a call option to reacquire them after seven years, if he elected to do so, than a true loan. *See Calloway*, 135 T.C. at 38.

**[5]** Optech's risk of loss would have arisen only if Sollberger had actually repaid the loan. *Id.* at 38-39. As the tax court found in a very similar case, where Derivium "lent" a taxpayer ninety percent of the value of his stock and then sold his stock, the "lender" had no economic incentive to expect or desire that the loan be repaid. *See id.* at 39. If the FRNs lost value after Sollberger transferred them to Optech, he would have been foolish to repay the nonrecourse loan at the end of the loan term, since he had no personal liability for the principal or interest allegedly due. *See id.* at 38. If Sollberger did not repay the loan, Optech could simply keep the profit it had already earned from selling the FRNs. But if the FRNs substantially increased in value above the balance due on the loan, Sollberger might have an incentive to repay his loan and exercise his option to repurchase the FRNs from Optech. *See id.* If that happened, Optech would be forced to reacquire the FRNs it had sold, thereby compelling it to sustain a loss. Thus, the only way Optech could have lost money on the transaction is if the FRNs had increased in value, motivating Sollberger to repay the loan and demand that the FRNs be returned to him. The fact that Optech did not expect or desire for the amount lent to be repaid is yet another indicator that the transaction was a sale. *See id.* at 38-39.

**[6]** Sollberger's and Optech's conduct also confirms our conclusion that the transaction was, in substance, a sale. Although interest accrued on the loan, Sollberger stopped receiving account statements and making interest payments after the first quarter of 2005, less than one year into the

seven-year loan term. Thus, neither Sollberger nor Optech maintained the appearance that a genuine debt existed for long. The total amount that Sollberger paid to Optech was de minimis compared to the size of the loan. The FRNs were also sold *before* Sollberger received the loan from Optech, which suggests that Optech funded the majority of the "loan amount" with the proceeds received from the sale of the FRNs. The apparent lack of any ability or intention by Optech to hold the FRNs as collateral to secure repayment of the loan further buttresses our conclusion that the transaction was merely a sale in the false garb of a loan. *See Gray*, 561 F.2d at 757.

Sollberger's arguments that the transaction was not a sale for tax purposes are easily addressed and discarded. Although Optech may have gotten the better end of the bargain because Sollberger received less than the full market value of the FRNs and still owes taxes on his gain, Sollberger received the benefit of his bargain. Perhaps like the taxpayer in *Calloway*, Sollberger engaged in the transaction because he believed he could receive ninety percent of his asset's value tax free. *See Calloway*, 135 T.C. at 38. If that was his belief, he was sorely mistaken, and the scheme only appears to be a theft in hindsight because it did not allow him to evade taxes. The fact that the sale of an asset, in the fullness of time, appears to have been a bad decision for a seller does not change the character of the transaction for tax purposes.[7] Thus, we reject Sollber-

---

[7]*See Don E. Williams Co. v. Comm'r*, 429 U.S. 569, 579-80 (1977) (stating that "a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred" and "[t]his Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not") (internal quotation marks and citation omitted); *Wash. Mut.*, 636 F.3d at 1221 ("Because the tax consequences of a transaction flow by operation of the tax law, the parties' failure to anticipate and negotiate all tax consequences of their transaction cannot be interpreted as limiting the transaction's tax consequences to only those expressly anticipated and bargained over by the parties.").

ger's argument that the sale was not really a sale because Optech profited at his expense.

Sollberger further argues that the transaction was not a sale for tax purposes because he retained the right to have his collateral returned on demand since Optech had not fulfilled a condition precedent under the Master Agreement to fund a loan or implement a hedging strategy. This argument is based on Sollberger's misreading of the relevant agreements. The Master Agreement provided that "[e]ither party may terminate this Agreement at any time prior to the Lender's receipt of the Collateral and the initiation of any of the Lender's hedging transactions." The Loan Schedule, which set forth the final terms of the loan, provided that the seven-year loan term would "start[ ] from the date on which final Loan proceeds are delivered on the Loan transaction." Optech was entitled to hold and sell the FRNs during the loan term, and Sollberger had no right to demand the return of the FRNs during that time period. Here, Sollbrger instructed his bank to transfer the FRNs to Optech on July 9, 2004, and Optech acknowledged receipt of the collateral on July 21, 2004. Optech then sold the FRNs on July 26, 2004 and delivered the loan proceeds to Sollberger on August 2, 2004. Sollberger did not attempt to void the agreement pursuant to the termination clause before Optech received and sold the FRNs. Although Optech may have breached the Master Agreement by selling the FRNs prior to the start of the loan term, as Sollberger contends, this breach does not transform the transaction into something other than a taxable sale of property. Accordingly, Sollberger's argument is unavailing.

[7] Sollberger also contends that he qualifies for the safe harbor for nonrecognition of gain or loss under 26 U.S.C. § 1058. We disagree. Section 1058 exempts certain transfers of securities from the capital gains tax so long as the transferor is entitled to receive payments in amounts equivalent to all interest that the owner of the securities is entitled to receive, and provided that the transfer does "not reduce the

risk of loss or opportunity for gain of the transferor." *See* 26 U.S.C. § 1058(b)(2), (3). Even assuming Sollberger did not waive this argument below, the Master Agreement gave Optech the right to receive all dividends and interest on the FRNs. The nonrecourse nature of the loan eliminated any risk that Sollberger would receive less than the loan amount, and the seven-year term during which Sollberger could not pay off the loan and receive the FRNs back eliminated his opportunity for gain for at least seven years. Thus, Sollberger is not eligible for the safe harbor because he fails to meet § 1058's requirements. *See Calloway*, 135 T.C. at 43-45; *see also Samueli v. Comm'r*, 661 F.3d 399, 407 (9th Cir. 2011) (agreeing that a transaction did not meet the requirements of § 1058 where the taxpayers relinquished all control over securities for all but 2 days in a term of approximately 450 days).

**[8]** Lastly, Sollberger also seems to argue that the transaction with Optech should not be treated as a sale under Treasury Regulation § 1.1001-1(a) or Revenue Ruling 57-451. Unlike the transaction described in Revenue Ruling 57-451, Sollberger transferred FRNs rather than stock to Optech, Sollberger received a loan amount in exchange for the FRNs, and Sollberger had no right to demand that he be put in the economic position he would have enjoyed as the owner of the FRNs had he not entered into the loan transaction. *See* Rev. Rul. 57-451, 1957-2 C.B. 295 (1957). Thus, Revenue Ruling 57-451 is of no help to Sollberger because this ruling requires that a transaction involve stock; that the transferor have the right to be restored, on demand, to the economic position he would have enjoyed as the owner of the stock, if he had not entered into the transaction; and that the transferee act as a custodian, not as a buyer, of the stock. *See id.*; *see also Calloway*, 135 T.C. at 42. Treasury Regulation § 1.1001-1(a) also does not help Sollberger because, as discussed above, he sold the FRNs for money, and the regulation expressly provides that "the conversion of property into cash . . . is treated as income or as loss sustained." Treas. Reg. § 1.1001-1(a). Thus,

Sollberger's argument that the transaction should be exempt under Treasury Regulation § 1.1001-1(a) is incorrect.

**[9]** We hold that Sollberger sold the FRNs to Optech, thereby triggering capital gains tax in 2004. Because Sollberger did not report selling the FRNs on his 2004 federal income tax return, we affirm the tax court's decision that there is a $128,979 deficiency in income tax due from Sollberger for the 2004 taxable year.

## CONCLUSION

For the foregoing reasons, we affirm the tax court.

**AFFIRMED.**