DAVID ROSBERG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rosberg v. Comm'r
Docket No. 12328-87 United States Tax Court
T.C. Memo 1990-328; 1990 Tax Ct. Memo LEXIS 346; 60 T.C.M. (CCH) 1; T.C.M. (RIA) 90328; July 2, 1990, Filed *346 Decision will be entered under Rule 155. Montie S. Day, for the petitioner. Cynthia K. Hustad, for the respondent. *347 SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioner's Federal income tax and additions to tax for the years and in the amounts as follows: Year
Deficiency
Additions to Tax, Section 6653(a) *[1]
1980
$ 13,125
$   656
1981 26,627 1,331
The issues for decision are (1) whether assessment and collection of any deficiencies in petitioner's income tax for the years 1980 and 1981 is barred by the period of limitations provided for in section 6501(a) or whether the 6-year period of section 6501(e) apply because of omissions *348 from petitioner's gross income in each year of an amount in excess of 25 percent of the gross income reported in that year; (2) if the 6-year period of limitations applies, whether petitioner underreported his income in each year as determined by respondent; and (3) if the 6-year period of limitations applies, whether petitioner is liable for additions to tax under section 6653(a) for 1980 and section 6653(a)(1) and section 6653(a)(2) for 1981. FINDINGS OF FACT Petitioner resided in South Lake Tahoe, California, at the time of the filing of his petition in this case. Petitioner filed his Federal income tax returns for the calendar years 1980 and 1981 with the Internal Revenue Service Center at Fresno, California on June 1, 1981, and on or about May 1, 1982, respectively. During 1980 and 1981, petitioner resided with Janine Biagi (Ms. Biagi). Although petitioner and Ms. Biagi were never married, Ms. Biagi went by the name Janine Rosberg during this period. In August 1980, petitioner and Ms. Biagi had one child, Shane. During the years at issue, petitioner owned and operated as a sole proprietor, an antique store known as the Antique Freak (the Antique Freak or the Store) which *349 was located in South Lake Tahoe. Ms. Biagi assisted petitioner in the operation of the Antique Freak. Petitioner originally acquired the Store in partnership with Ms. Hilda Sanford but, in 1978, the partnership was dissolved and petitioner became the sole proprietor of the Antique Freak. As of December 31, 1979, petitioner was indebted, in connection with the Antique Freak, to El Dorado Savings and Loan Association (El Dorado Savings) in the principal amount of $ 22,281.05 and was indebted to Mr. Burt Jakobson in the principal amount of $ 17,149.73. During 1980, petitioner paid a total of $ 6,000 in interest and principal on his debt to El Dorado Savings and a total of $ 2,000 in interest and principal on his debt to Mr. Jakobson. During 1981, petitioner paid a total of $ 6,000 in interest and principal on his debt to El Dorado Savings and a total of $ 2,800 in interest and principal on his debt to Mr. Jakobson. In addition, petitioner made payments of $ 139 per month on a truck loan throughout the years at issue for a total of $ 1,668 in 1980 and $ 1,668 in 1981. Petitioner advertised the business of the Antique Freak in newspapers. Petitioner, in connection with the business *350 of the Antique Freak, purchased and resold antiques, brass, and used furniture. Ms. Biagi maintained a spiral notebook of transactions of the Antique Freak at the front desk of the Store, in which records of the purchases and sales of the Antique Freak were recorded. During 1980 and 1981, petitioner maintained a bank account in the name of the Antique Freak at the Tahoe Valley Office of Central Bank (Central Bank). Petitioner deposited gross receipts from the Antique Freak, whether in the form of cash or checks, in this account. Petitioner purchased some merchandise for resale with cash. Petitioner would also purchase some merchandise by check, utilizing funds deposited in the account at Central Bank. On January 28, 1981, Ms. Biagi wrote a check in the amount of $ 100 on the account of the Antique Freak which bears the notation, "consignment." This is the only check produced at the trial of this case that bears such a notation and most of the other checks for purchases bear a notation, "inventory." In December 1979, petitioner purchased a residence located at 272 Upland in South Lake Tahoe from William Eipper (Mr. Eipper). The total purchase price of the home was $ 115,000. *351 A cash payment in the amount of $ 31,000 was made at the time of purchase and Mr. Eipper took back a promissory note in the amount of $ 84,000 (the Eipper note), which provided for interest at an annual rate of 11 percent. The Eipper note, which was dated December 18, 1979, provided that petitioner would pay Mr. Eipper $ 650 per month beginning on January 26, 1980, and continuing monthly until December 26, 1980, at which date a principal reduction in the amount of $ 20,000 and interest in the amount of $ 1,440 would become due and payable. Thereafter, monthly payments in the amount of $ 587 would be due and payable on the 26th of each month (plus a 14-day grace period), commencing on January 26, 1981, and continuing until December 26, 1981, at which date any remaining principal balance and any interest accrued thereon would become due and payable. In accordance with the Eipper note, petitioner and Ms. Biagi made 11 monthly payments of $ 650 each during 1980 for a total of $ 7,150. Petitioner made a twelfth $ 650 payment by check on January 7, 1981. This check contains the notation, "Next payment go to $ 587.00 mo." Thereafter, petitioner and Ms. Biagi paid Mr. Eipper $ 587 per *352 month on the Eipper note. At the end of 1981, petitioner and Ms. Biagi did not have sufficient funds to pay off the remaining principal balance due on the Eipper note on December 26, 1981. On December 30, 1981, petitioner executed a new renegotiated promissory note in the principal amount of $ 64,000 and deed of trust in favor of Mr. Eipper. Ms. Biagi also signed the new note using the name Janine Rosberg. The new note provided for a higher rate of interest, 14 percent, and a higher monthly payment amount, $ 800. Petitioner treated the payments made on the note during 1980 and 1981 as interest-only payments. During the years 1975 through 1981, petitioner owned assets in addition to the Antique Freak and his residence. Petitioner inherited three condominium units with an address of 1223 Bonanza from his father in 1969. Beginning in 1971, he converted these units into rental units. Petitioner sold one of the condominium units in 1976 and transferred another condominium unit to his former partner, Ms. Sanford, in 1978. Petitioner sold the third condominium unit in 1980 and, according to escrow documents prepared by Sierra-El Dorado Title Company, received $ 26,040.89 in cash *353 proceeds from the sale. In August 1976, petitioner purchased real estate known as 1211 Julie Lane, South Lake Tahoe from Ms. Sadie R. Pinley. The first note and deed of trust on the property was obtained through El Dorado Savings. Petitioner paid $ 2,552 on this first note in 1980 and $ 2,784 in 1981. The seller carried a second note and deed of trust with collections handled through Tahoe Savings at South Lake Tahoe, California (Tahoe Savings). Petitioner paid $ 704 on this second note in 1980 and $ 704 in 1981. Petitioner converted the Julie Lane property into a rental unit. In 1977, petitioner purchased a mobile home which he financed through Tahoe Savings. On June 4, 1981, petitioner borrowed $ 5,500 from Central Bank and repaid the balance on this loan to Tahoe Savings on July 1, 1981. During the years 1975 through 1981, petitioner also owned: 1) a used Toyota Corolla; 2) a 1958 pick-up truck; 3) a 1966 G.M.C. truck; 4) a Honda; 5) a vehicle consisting of seven cars welded together; 6) a Jaguar XKE; 7) business furniture and equipment; 8) antiques and furniture for resale, some of which were acquired by inheritance; and 10) personal clothing and effects. During this *354 period, petitioner acquired no other assets by inheritance. During the years 1975 through 1981, petitioner owned only those assets specifically enumerated in this opinion. During the years at issue, petitioner retained, at one time or another, three different accountants, Mr. Robbie Grant, Ms. Margaret Tregaskis, and Mr. B. Joe Rosa, Jr. Generally, Ms. Biagi, rather than petitioner, communicated with the accountants on behalf of petitioner's business, the Antique Freak. Ms. Biagi took whatever records were kept (the notebook, cancelled checks, etc.) to the accountant. However, petitioner's accountants did not reconcile such records with petitioner's banking records. Each accountant maintained records and prepared financial statements for the Antique Freak. Mr. Grant prepared petitioner's 1979 Federal income tax return. Petitioner's 1980 Federal income tax return, which was filed on June 1, 1981, was prepared by Ms. Tregaskis in accordance with the figures and amounts contained in petitioner's accounting records. On his 1980 return, petitioner claimed "head of household" filing status and claimed exemptions for himself, Ms. Biagi, and their son, Shane. Petitioner filed a Form *355 1040, stated to be a joint 1981 Federal income tax return with Ms. Biagi. Petitioner's 1981 Federal income tax return was prepared by Mr. Rosa in accordance with the figures and amounts contained in the accounting records. On the 1981 return, petitioner claimed three exemptions (one each for himself, Ms. Biagi, and Shane) and utilized the tax rates applicable to married persons filing jointly in computing his tax liability. Both the 1980 and 1981 returns were properly executed by petitioner under penalties of perjury. According to petitioner's 1980 Federal income tax return and the records maintained by his accountants in 1980, petitioner received gross receipts in the amount of $ 100,315.76 from the Antique Freak and had returns and allowances in the amount of $ 324.70. According to the return and records, petitioner paid $ 54,158.62 for inventoried merchandise during 1980. Petitioner's total 1980 business expenses according to the return and records, excluding bad debts, depreciation, and amortization, amounted to $ 39,802. According to petitioner's accounting records, as of January 1, 1980, petitioner had an accounts receivable balance of $ 3,800 and an accounts payable *356 balance of $ 319.21 (representing sales tax payable). His "cash in bank" balance on January 1, 1980, was a negative $ 3,881.19. As of December 31, 1980, petitioner had an accounts receivable balance of zero, an accounts payable balance of negative $ 102.93 (representing sales and Federal taxes payable), and a "cash in bank" balance of $ 199.16. In addition to the foregoing, on his 1980 return, petitioner reported gross rental income in the amount of $ 3,125. He deducted total rental expense in the amount of $ 3,863, including $ 666 in depreciation deductions. Petitioner also reported $ 35,000 as the amount realized from the sale of one of the condominiums which he had inherited. Petitioner claimed a basis of $ 7,159 in the condominium and thus reported a long term capital gain in the amount of $ 27,841. According to the records maintained by his accountants, during his 1981 tax year, petitioner received gross receipts in the amount of $ 176,495.76 from the Antique Freak and had returns and allowances in the amount of $ 2,766.90. On his 1981 Federal income tax return, petitioner reported gross receipts in the amount of $ 173,729 ($ 176,495.76 minus $ 2,766.90). According *357 to his accounting records and tax return, petitioner paid $ 130,539 for inventoried merchandise and contract labor during 1981 and his total business expenses during 1981, excluding bad debts, depreciation, and amortization, amounted to $ 49,521, including $ 12,300 paid to Ms. Biagi as compensation for services which she performed in connection with the Antique Freak. As of January 1, 1981, petitioner's records showed an accounts receivable balance of zero, an accounts payable balance of negative $ 102.93 (representing sales and Federal taxes payable), and a "cash in bank" balance of $ 199.16. As of December 31, 1981, petitioner's records showed an accounts receivable balance of zero, an accounts payable balance of negative $ 237.02 (representing sales and payroll taxes payable), and a "cash in bank" balance of $ 3,030.97. On his 1981 return, petitioner reported gross income from wages in the amount of $ 12,300. He deducted rental expense in the amount $ 4,817, including $ 666 in depreciation deductions, but reported no rental income. Although the account at Central Bank was maintained in the name of the Antique Freak, petitioner also paid personal expenses out of this account. *358 Each of petitioner's accountants kept records of petitioner's personal expenditures which were sometimes paid from this account at Central Bank and which were shown as a draw from petitioner's sole proprietorship. During 1980, petitioner's records showed that he paid personal living expenses in the amount of $ 24,517.18 out of this account and, during 1981, paid personal living expenses in the amount of $ 32,117.33 out of this account. In 1982, Mr. Glen Enoksen (Special Agent Enoksen), a special agent for the Criminal Investigation Division (CID) of the Internal Revenue Service, began an investigation of petitioner's 1980 and 1981 tax years. Special Agent Enoksen was the first agent assigned to petitioner's case and, at the time, was the only agent working on petitioner's case. Special Agent Enoksen contacted petitioner personally once to read him his rights. Thereafter, Special Agent Enoksen dealt only with petitioner's attorney, Mr. Montie Day (Mr. Day), to whom petitioner had granted a power of attorney. Special Agent Enoksen's investigation revealed unreported income in 1980 and 1981 of no more than $ 10,000 per year. By letter dated February 29, 1984, petitioner was advised *359 that Special Agent Enoksen had closed the case against him. Special Agent Enoksen recommended that criminal proceedings not be instituted. The case was then returned to the Examination Division for civil consideration. As part of his investigation, Special Agent Enoksen obtained, by summons, petitioner's accounting records relating to his 1979, 1980, and 1981 tax years from Mr. Grant, Ms. Tregaskis, and Mr. Rosa. Special Agent Enoksen also issued summonses requesting any banking records relating to David Rosberg, the Antique Freak, or Ms. Biagi from several institutions in the Tahoe area, including Central Bank, El Dorado Savings, Tahoe Savings, Wells Fargo Bank in Lake Tahoe, First Interstate Bank in Reno, and First National Bank in Colorado. In response to his summonses, Special Agent Enoksen received monthly statements and canceled checks relating to 1980 and 1981 from the account maintained at Central Bank in the name of the Antique Freak. However, these records were incomplete in that several monthly statements for 1980 were unavailable and several canceled checks were missing for both 1980 and 1981. Special Agent Enoksen received no other records relevant to the controversy *360 herein. In March 1984, petitioner's case was assigned to Revenue Agent Mollie Blicharz (Agent Blicharz) for civil consideration by the Examination Division. Agent Blicharz performed a "Cash Transactions (T) Account" (T account) analysis of petitioner's 1980 and 1981 tax years. Agent Blicharz' use of the T account analysis was authorized by section 643.7 of the Internal Revenue Manual (the manual). The T account analysis treats all income and all expenditures as cash transactions flowing in and out of an account. According to the manual, if outflow from the T account exceeds inflow into the account, the excess represents an understatement of gross receipts. Section 643.71 of the manual cautions that any understatement revealed by the T account analysis may be attributable to unreported gross receipts, overstated deductions, omitted nontaxable income, or any combination of these items and that, if the "debit column" is substantially larger than the "credit column," further investigation is warranted. Through use of the T account method, Agent Blicharz determined that there was an understatement of income in each of the years 1980 and 1981. On April 19, 1984, Agent Blicharz contacted *361 Mr. Day to inform him that the period of limitations with respect to petitioner's 1980 tax year would expire shortly and to solicit an extension of such period if Mr. Day did not agree with the taxes computed by the Service. Mr. Day subsequently told Ms. Blicharz that he would not contest the proposed adjustments for the 1980 tax year but that he wished to review her computations for petitioner's 1981 tax year. Ms. Blicharz did not supply Mr. Day with any such computations. Agent Blicharz re-referred petitioner's case to CID on May 1, 1984. On May 15, 1984, Agent Blicharz received permission from CID and the Examination Division to let the 3-year period of limitations with respect to petitioner's 1980 tax year expire. On May 16, 1984, Mr. Day refused to execute an extension of the period of limitations with respect to petitioner's 1980 tax year. Special Agent Michael Salmonson (Special Agent Salmonson) of CID was assigned to investigate the case jointly with Ms. Blicharz in June or July 1984. As part of their investigation, Agent Blicharz and Special Agent Salmonson interviewed petitioner's accountants. By letter dated April 9, 1985, Mr. Day notified Agent Blicharz that petitioners *362 would decline to extend the period of limitations with respect to their 1981 tax year. On May 23, 1985, CID notified petitioner that he was no longer subject to criminal investigation with respect to his 1980 and 1981 tax years. By memorandum dated April 7, 1986, Agent Blicharz forwarded her T account reconstruction of income for petitioner's 1980 and 1981 tax years to Mr. Day. The following are reproductions of the 1980 and 1981 T accounts prepared by Agent Blicharz: T ACCOUNT 1980 Inflow
Gross Receipts
100,316 Less Returns
(325)
Gross Rents
3,125 Cash on Hand 1/1/80 Estimated
100 Cash in Banks 1/1/80
(3,881)
Accounts Receivable 1/1/80
3,800 Accounts Payable 12/31/80
(103)
Cash From Sale of 1223 Bonanza
26,041 129,073 Additional Income
34,576 163,649 Outflow
Business Expenses Less Amortization, Bad
Debts, and Depreciation
39,802
Purchases for Business
54,159
Rental Expenses Less Depreciation
3,197
Personal Living Expenses
24,517
Cash on Hand 12/31/80 Estimated
100
Cash in Banks 12/31/80
199
Loan Payments:
El Dorado Savings -- 1211 Julie
2,784 -- Store
6,000
Bert Jakobson
2,400
Tahoe Savings     -- Motorhome
1,668 -- Sadie Pinley ($ 64 X 11)
704
William Eipper    -- Note Payment
7,800 Principal
20,000
Accounts Receivable at 12/31/80
--
Accounts Payable at 1/1/80
319
163,649
*363 T ACCOUNT 1981 Inflow$
Gross Receipts
173,729
Cash on Hand 1/1/81
100
Cash in Banks 1/1/81
199
Loans
5,500
Accounts Receivable 1/1/81
--
Accounts Payable 12/31/81
237
179,765
Additional Income
66,341
246,106
Outflow
Business Expenses Less Depreciation
and Bad Debts
49,521 Purchases
130,539 Rental Expenses Less Depreciation
4,151 Personal Living Expenses
32,117 Loan Repayment
5,500 Cash on Hand 12/31/81
100 Cash in Banks 12/31/81
3,031 Loan Repayments
El Dorado Savings -- 1211 Julie
2,784  -- Store
6,000 Bert Jakobson
2,400 Tahoe Savings     -- Motorhome
1,668  -- Sadie Pinley
704 William Eipper
7,694 Accounts Receivable at 12/31/81
-- Accounts Payable at 1/1/81
(103)
246,106 On April 30, 1986, Agent Blicharz closed her investigation of petitioner's 1980 and 1981 tax years. During the investigation phase of this case, petitioner offered several explanations for the imbalance revealed by Agent Blicharz' T account analysis but, at no time, prior to the filing of *364 the petition in this case, did petitioner suggest that the imbalance was due to consignment sales. After Agent Blicharz closed her investigation, the case was referred to the Service's review staff for issuance of a 30-day letter. By letter dated May 2, 1986, Mr. Day indicated to Ms. Blicharz that, when the 30-day letter was issued by the Service, he wished to schedule an appeals conference with the Appeals Division. By letter dated September 4, 1986, addressed to "Review Coordinator," Mr. Day indicated that he did not agree with the adjustments proposed in the 30-day letter and that, "if the Internal Revenue Service is willing to reconsider its position in this case, we would be willing to discuss it with an Appeals Officer." No appeals conference was ever held in connection with petitioner's case. The notice of deficiency in this case was issued on February 10, 1987. In his notice of deficiency, respondent increased petitioner's 1980 income by $ 34,576 in accordance with Agent Blicharz' T account analysis. Respondent also increased petitioner's 1980 self-employment tax by $ 2,098. In addition, respondent determined that petitioner's basis in the condominium which he sold *365 in 1980 was zero, rather than $ 7,159, and thus increased petitioner's 1980 income by $ 2,864 ($ 7,159 X 40 percent). Finally, respondent determined that petitioner was entitled to claim an investment tax credit in the amount of $ 191 and that petitioner was liable for an addition to tax under section 6653(a) for his 1980 tax year. Respondent increased petitioner's reported income for 1981 by $ 66,341 in accordance with Agent Blicharz' T account analysis and increased petitioner's 1981 self-employment tax by $ 2,762. Respondent also determined that petitioner was not entitled to claim an exemption for Ms. Biagi and that petitioner was not entitled to use the rates applicable to married taxpayers filing jointly. Respondent also determined that petitioner's total itemized deductions should be increased by $ 1,100 and that petitioner was liable for additions to tax under section 6653(a)(1) and section 6653(a)(2). OPINION Section 6501(a) provides that, as a general rule, any income tax imposed by the Internal Revenue Code must be assessed within 3 years after the date the taxpayer's return *366 is filed. There are, however, exceptions to this general rule. One of these exceptions is section 6501(e), which provides that in the case of a substantial omission of gross income, the tax may be assessed at any time within 6 years after the taxpayer files his return. Petitioner filed his 1980 return on June 1, 1981, and his 1981 return on or about May 1, 1982. Therefore, the 3-year period provided for in section 6501(a) expired on June 1, 1984, for the year 1980 and May 1, 1985, for the year 1981. The notice of deficiency was mailed February 10, 1987, after the general 3-year period of limitations had expired with respect to petitioner's 1980 and 1981 tax years. Respondent does not contend otherwise. Respondent does contend that petitioner omitted a substantial amount of gross income from his 1980 and 1981 returns and, therefore, under section 6501(e), the 6-year period of limitations applies to petitioner's 1980 and 1981 tax years. The notice of deficiency was mailed within 6 years after the filing of petitioner's return for each of the years 1980 and 1981. Petitioner concedes this fact, but contends that respondent has failed to show the applicability to these years *367 of section 6501(e). Section 6501(e)(1)(A) provides, in pertinent part, that: (A) GENERAL RULE. -- If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed * * * at any time within 6 years after the return was filed. For purposes of this subparagraph -- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services * * * . Respondent bears the burden of proving that this extended 6-year period of limitations is applicable to petitioner's 1980 and 1981 tax years. Gray v. Commissioner, 56 T.C. 1032, 1059 (1971); revd. and remanded on another issue 561 F.2d 753 (9th Cir. 1977); Stratton v. Commissioner, 54 T.C. 255, 289 (1970); *368 Bardwell v. Commissioner, 38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963). In the instant case, the parties have stipulated that petitioner reported the following amounts of gross income: Item
1980
1981
Income from antique
business (Schedule C)
$ 100,316.00
$ 173,729.00
Income from rental
properties (Schedule E)
3,125.00
-0-
Gains from sales or
exchanges of capital
assets (Schedule D)
27,841.00
-0-
Wages
-0-
-12,300.00
Total gross income reported
$ 131,282.00
$ 186,029.00
In order to establish that the 6-year period provided for in section 6501(e) is applicable to petitioner's 1980 tax year, respondent must show that petitioner omitted from gross income an amount properly includable therein in excess of $ 32,820.50 ($ 131,282 multiplied by 25 percent), and in order to show the applicability of section 6501(e) to petitioner's 1981 tax year, respondent must show that petitioner omitted from gross income an amount properly includable therein in excess of $ 46,507.25 ($ 186,029 multiplied by 25 percent). Davenport v. Commissioner, 48 T.C. 921, 925 (1967). *369 Once respondent has made this prima facie showing of the applicability of section 6501(e), the burden of going forward with evidence sufficient to rebut such showing shifts to petitioner. Estate of Gibbs v. Commissioner, 21 T.C. 443, 447 (1954). Respondent concedes that several 1980 loan payments, totaling $ 1,282, are undocumented and should not have been included on the outflow side of the 1980 T account. He contends, however, that petitioners made an interest payment of $ 1,440 to Mr. Eipper in 1980 that was not, but should have been, included as outflow. Respondent thus claims that petitioner omitted gross income in the amount of $ 34,734.00 (which exceeds 25 percent of his 1980 reported gross income by $ 1,913.50) for his 1980 tax year and omitted gross income in the amount of $ 66,341.00 (which exceeds 25 percent of his 1981 reported gross income by $ 19,833.75) for his 1981 tax year. Therefore, respondent contends, the 6-year statute of limitations is applicable to both years. Petitioner argues that, because the T account method is an indirect method of income reconstruction, the imbalances revealed by *370 respondent's T account analyses do not necessarily indicate an omission of gross income (or, in the case of a trade or business, gross receipts). Petitioner also contends that, even if the T account method can be used to prove an omission of gross income, respondent's T account analyses in this case are flawed due to computational errors and unsubstantiated inferences. We agree that indirect methods of income reconstruction, such as the T account method, the bank deposits method, or the net worth method, do not, without more, establish a substantial omission of gross income within the meaning of section 6501(e). In Hurley v. Commissioner, 22 T.C. 1256 (1954), affd. on another issue 233 F.2d 177 (6th Cir. 1956), respondent utilized the net worth method of income reconstruction to determine that the taxpayer had understated his net income. Respondent then argued that, since the taxpayer's understatement of net income exceeded 25 percent of the gross income stated on his return, it was reasonable to infer that the taxpayer must have omitted an equal or greater *371 amount of gross income from his return. Respondent thus claimed to have met his burden of proving the applicability of the extended period of limitations. In rejecting respondent's argument, we stated that: We have said that the method employed by respondent "is a method of reconstructing income rather than a method of computing it." It is an indirect method of arriving at unreported net income and ignores , factors used when applying the statutory provision. * * * The method does not require identification of items of gross income or all of the statutory deductions in arriving at the result. * * * A computation by the net worth method could result in an increased net income by reason of deductions having no factual basis. * * * The theory advanced by respondent ignores that probability completely and requires an inference, lacking a reasonable basis, that all of the additional net income resulted from omissions of gross income. [Citation omitted. Hurley v. Commissioner, supra at 1264-1265.]
The T or cash account method employed by respondent in the instant case is similarly an indirect method of income reconstruction but is based on somewhat *372 different assumptions. See Petzoldt v. Commissioner, 92 T.C. 661, 694 (1989).Because the amount of additional unreported income determined by respondent is, in effect, dependent on the "outflow" side of the T account, the computation, unexplained, does not identify the omitted income as being gross income or receipts. Just as in a net worth case, the underreported income could result from an overstatement of deductions or receipt of nontaxable funds. We agree with petitioner that the mere existence of a T account imbalance is insufficient to meet respondent's burden of proof of the omission of gross income. It is incumbent upon respondent to prove that the T account imbalance in each year resulted from petitioner's omission of gross income rather than excessive deductions or other causes. Courtney v. Commissioner, 28 T.C. 658, 668 (1957); Hurley v. Commissioner, supra at 1265.Even if respondent does prove that the imbalances did not result from excessive or overstated deductions, he must also establish either the likely source of the additional income represented by the T account imbalance or establish that there are *373 no nontaxable sources such as loans, gifts, sales of property without gain, or inheritances for such income. United States v. Massei, 355 U.S. 595 (1958); Holland v. United States, 348 U.S. 121 (1954); Dupree v. United States, 218 F.2d 781 (5th Cir. 1955); Petzoldt v. Commissioner, supra at 695-696. In the instant case, respondent has established that the imbalances in his T account analyses for each year are not due to overstated or excessive deductions. Respondent obtained the amount of business expenses for each year which he included in his T account analyses directly from petitioner's 1980 and 1981 income tax returns. It is well settled that the figures supplied by a taxpayer in his tax return, although not conclusive, constitute an admission by the taxpayer of the accuracy of the amounts. Bank of the West v. Commissioner, 93 T.C. 462, 468 (1989); Kenyatta Corp. v. Commissioner, 86 T.C. 171, 182 (1986), affd. 812 F.2d 577 (9th Cir. 1987); McShain v. Commissioner, 71 T.C. 998, 1010 (1979).Petitioner indicated his agreement with *374 the business expense deductions by signing each return under penalties of perjury and therefore we accord such figures substantial weight. With the exception of the $ 12,300 in wages paid to Ms. Biagi, petitioner's accounting records fully support the deductions and purchases reported on petitioner's 1980 and 1981 tax returns. Against this cogent evidence, petitioner offers nothing but speculation that certain amounts may not have been paid as reported in the returns. For example, petitioner speculates that the $ 12,300 in wages he claimed as a deduction on Schedule C, "Profit or (Loss) From Business or Profession," were not actually paid to Ms. Biagi in 1981 and thus, according to petitioner, the outflow side of the 1981 T account should be reduced. It is clear, however, that Ms. Biagi provided services to petitioner and his business. On the return for 1981, which purported to be a joint return of petitioner and Ms. Biagi, this $ 12,300 is reported as wages. Furthermore, both petitioner and Ms. Biagi took the stand at trial and neither denied that such wages were paid or received. Similarly, petitioner had the opportunity to testify that the other deductions reported on his *375 returns were groundless or overstated. Yet, he never did so. Under these circumstances, we conclude that respondent has met his burden of proving that the T account imbalances were not the result of overstated deductions. We also conclude that respondent has established that there are no nontaxable sources for the additional unreported receipts which the T account imbalances may represent and has also established a likely source for the omitted receipts. In 1969, petitioner inherited three condominiums from his father's estate. He disposed of two condominiums in prior years and sold the third in 1980. The proceeds from such sale, $ 26,041, were fully accounted for on the inflow side of the 1980 T account and petitioner does not contend otherwise. The parties have stipulated that petitioner received no inheritances during the years 1975 through 1981. Respondent has thus eliminated inheritance as a possible source of nontaxable income during the years at issue. The parties have also stipulated that petitioner owned no assets during the years 1975 through 1981 other than those accounted for by respondent. None of these assets, in and of themselves, represent a possible source *376 of nontaxable income. In addition, respondent's investigation revealed no gifts, undisclosed bank accounts, unaccounted for loan proceeds, or other hidden sources of funds. Petitioner does not claim that he accumulated a cash hoard prior to the years at issue nor does he claim to have sold any other assets during the years at issue. We, therefore, conclude that respondent has eliminated the possibility that the imbalances revealed by his T account analyses were caused by petitioner's receipt of nontaxable income. In addition, we conclude that the evidence in this case reveals a likely source of unreported income, namely petitioner's antique business. Both petitioner and Ms. Biagi testified that all transactions, including cash receipts, were recorded on a daily basis in a notebook which was kept at the front desk. Although Ms. Biagi testified that she brought this notebook to petitioner's accountants, it is quite apparent that many of the transactions listed therein were not taken into account when petitioner's tax returns were prepared. The evidence also indicates that the accounting records which petitioner's accountants prepared were not reconciled to his bank statements *377 and thus proceeds from cash sales which were deposited in the account at Central Bank may not have been reported on petitioner's income tax returns even though they may have been recorded in the notebook. We conclude that respondent has established unreported sales receipts as a likely source of the T account imbalances. As noted, petitioner's second argument is that, even if the T account method can be used to prove an omission of gross income, respondent's T account analyses in this case are not probative because respondent committed computational errors and made unsubstantiated inferences that led to the claimed imbalances. Because the burden of proof as to an omission from gross income of an amount in excess of 25 percent of the gross income reported in this case is on respondent, we must require that each item in respondent's T account (funds available at the beginning of each year, accounts receivable and payable, personal expenditures, etc.) be sufficiently substantiated so that petitioner is not charged with income which he did not receive. See Dupree v. United States, 218 F.2d 781, 784 (5th Cir. 1955).We conclude, based on the evidence presented in this *378 case, that respondent has, except as discussed below, substantiated each item in his T account analyses. Therefore, we will only discuss the specific items with respect to which petitioner has raised an objection. Petitioner first argues that respondent erred by including the full amount of gross receipts and purchases that were reported on petitioner's return as inflow and outflow, respectively, in the 1980 and 1981 T account analyses. Petitioner bases this argument on his claim that 20 to 30 percent of the transactions reported on his income tax returns as purchases and sales were actually commissioned consignment sales. According to petitioner, if a portion of these sales are treated as consignment sales, his total gross receipts for each year would be significantly reduced since only the commission on each consignment item would be included in gross receipts rather than the full sales price as originally reported on his returns. Respondent initially contends that petitioner had very few, if any, consignment sales during the years at issue. Respondent also argues however that, even if a portion of the sales reported on petitioner's 1980 and 1981 returns were actually consignment *379 sales, the 6-year statute of limitations would still apply. Respondent reasons that if a portion of gross receipts is removed from the inflow side of the 1980 and 1981 T account due to the purported consignment sales, a like amount in purchases must be removed from the outflow side of the 1980 and 1981 T account and, therefore, the imbalance in each such account remains exactly the same. Thus, according to respondent, petitioner has omitted the same amount of gross income regardless of how his sales are treated and, therefore, the 6-year statute of limitations still applies. We agree with respondent's initial argument that petitioner had very little, if any, consignment sales during the years at issue and, therefore, need not reach his second argument that the existence of consignment sales would make no difference to the outcome of this case. As noted previously, the treatment accorded an item and the figures supplied by a taxpayer on his Federal income tax return, although not conclusive, constitute an admission where the taxpayer takes a later inconsistent position with respect to the item. Bank of the West v. Commissioner, 93 T.C. at 468; Kenyatta Corp. v. Commissioner, 86 T.C. at 182; *380 McShain v. Commissioner, 71 T.C. 998, 1010 (1979). Here, petitioner treated the sale of all items, whether on consignment or not, as straight purchases and resales on his income tax returns. He reported the full amount of each item's sales price as gross receipts and reported the full amount paid to the seller of each item as an inventory purchase. Furthermore, his accounting records fully support the treatment accorded these amounts on his return and give no indication whatsoever that a portion of his sales were actually consignment sales. In contrast, petitioner has brought forth only meager and unreliable evidence to support his claim that a portion of the reported sales were on consignment. Petitioner did testify at trial that 20 to 30 percent of his sales were consignment sales for which he received a 10-percent commission. However, he was evasive and forgetful on the stand and we choose not to believe this self-serving testimony. Furthermore, he never claimed, during the course of Ms. Blicharz' investigation of his case or at any other time prior to the filing of his petition, that any portion of his sales were on consignment. Similarly, Ms. Biagi *381 testified that 20 to 30 percent of petitioner's sales were on consignment. However, at trial, she was also forgetful and did not always appear to be testifying from memory. For example, at one point, she testified that petitioner received a 20- to 30-percent commission on his consignment sales. She had to be reminded by petitioner's counsel that these percentages referred to the total amount of sales which were purportedly on consignment rather than the percentage commission which petitioner purportedly received. Petitioner also introduced the testimony of a man named Jack Francis who purportedly worked for petitioner during the years at issue. Although Mr. Francis, in general, supported petitioner's claims, we could find absolutely no evidence in petitioner's income tax returns, accounting records, or bank statements that Mr. Francis ever worked for, or received wages from, petitioner (even though we found ample evidence of persons who clearly worked for petitioner but were not called to testify at trial). Therefore, we do not assign much weight to Mr. Francis' testimony. Petitioner claims that the notebook in which the daily transactions of the Antique Freak were recorded *382 supports his testimony that a large percentage of his sales were on consignment. Yet this notebook, which was purportedly given to petitioner's accountants, was not located during respondent's investigation and was not introduced as evidence at trial. We could not, therefore, verify petitioner's claims. Nor do we believe that one small check bearing the notation "consignment," rather than "inventory," supports petitioner's claim that 20 to 30 percent of his sales were consignment sales. Most of the other checks bore the notation "inventory." In short, after weighing the evidence introduced in this case, we conclude that petitioner had no consignment sales in 1980 and possibly one $ 100 consignment sale in 1981. Thus, respondent correctly concluded that the imbalance in the T account was unreported gross receipts and that the amount of gross receipts and purchases reported by petitioner on his 1980 and 1981 tax return were, in fact, gross receipts and purchases. Petitioner next argues that, in performing her T account analyses, Ms. Blicharz erred in assuming, without any further investigation, that petitioner had only a minimal amount of cash on hand at the beginning of each year *383 at issue. Petitioner argues that, in the antique business, it is not unusual to have large amounts of cash on hand. Petitioner points to his testimony that he often purchased furniture with cash or received cash in payment for furniture. He estimated that he had between $ 500 and $ 5,000 in cash on hand at any particular time. Petitioner thus argues that respondent's assumption that he had only $ 100 cash on hand at the beginning of each year is unwarranted and renders the T account analyses unreliable. While we do not accept much of petitioner's testimony because of the evasiveness of his answers to most questions, we are inclined to accept his testimony that he generally had at least $ 500 cash on hand because of the nature of the business. Respondent is charged with the burden of proving that the extended period of limitations applies and, therefore, that his assumptions about available cash are reasonably correct. See Dupree v. United States, 218 F.2d 781, 784 (5th Cir. 1955).We point out that in the typical situation it may be virtually impossible, several years later, to prove exactly how much cash a taxpayer has on hand at any one time during *384 a taxable year under investigation. In some cases, it may be that the only way respondent can establish these amounts will be through estimates or inferences which may be supported by persuasive evidence such as books of account or expert testimony. In the instant case, the only evidence introduced as to cash on hand was petitioner's testimony that he had approximately the same range of cash, not less than $ 500 or more than $ 5,000, on hand at the end of 1979, 1980, and 1981, and at most times during these years. If the amount of cash on hand at the beginning of each year is the same as at the end of such year, the two figures would simply net out and would have no net effect on the T account imbalances determined by respondent. However, petitioner's testimony was the range of the cash he had on hand, not the precise amount. However, with respect to petitioner's 1981 tax year, we need not determine where, in this range, the cash held by petitioner fell at the beginning and end of the year. As noted, the maximum amount of cash petitioner claimed to have on hand at any one time was $ 5,000. If we assume that petitioner did indeed have on hand $ 5,000 in cash at the beginning *385 of 1981 and we assume that petitioner had $ 500 cash on hand at the end of 1981, the minimum amount he stated he ever had on hand, the outflow side of the 1981 T account and, consequently, the T account imbalance would, at most, be reduced by approximately $ 4,500 to $ 61,841. This amount is still far in excess of $ 46,507.25, which is 25 percent of petitioner's 1981 reported gross income. Therefore, even if we draw all assumptions in favor of petitioner, the extended period of limitations still applies to petitioner's 1981 tax year. However, such is not the case with respect to petitioner's 1980 tax year. After the $ 1,282 in loan payments which respondent concedes are undocumented are removed from the outflow side of the 1980 T account (but before the $ 1,440 additional interest payment claimed by respondent is added in), the T account imbalance for 1980 is reduced to $ 33,294. This imbalance exceeds 25 percent of petitioner's reported gross income of $ 131,282 by just $ 473.50. If we assume that petitioner had on hand cash in the amount of $ 574.50 at the beginning of 1980, rather than the $ 100 estimated by Ms. Blicharz, but only the $ 100 estimated by Ms. Blicharz at the *386 end of 1980, the T account imbalance would be reduced to $ 32,269.50, one dollar short of the amount required for the application of the 6-year period of limitations. The consequences of an improper or inaccurate estimate of cash on hand in this case for the year 1980, are just too great to allow respondent to meet his burden of proof through bare estimates. We, therefore, agree with petitioner that respondent's 1980 T account analysis cannot be relied upon to prove the applicability of the 6-year period of limitations. Respondent's 1980 T account is weak in still another respect. As noted previously, in connection with the purchase of his residence, petitioner became obligated under the Eipper note to pay $ 20,000 in principal and $ 1,440 in interest on December 26, 1980, at which time his monthly payment would drop from $ 650 to $ 587. In the notice of deficiency, respondent determined that petitioner made a principal payment of $ 20,000 at the end of 1980 in accordance with the Eipper note and, therefore, this amount should be included as outflow in the 1980 T account. On brief, respondent asserts that petitioner made an additional interest payment during 1980 in the amount *387 of $ 1,440 and that this payment should also be included in the outflow side of petitioner's 1980 T account. There is indirect evidence in this case which indicates that the $ 20,000 principal payment and $ 1,440 interest payment were made at some time prior to the end of 1981. The fact that the principal amount of the second note, which resulted from Ms. Biagi's 1981 renegotiation of the Eipper note, was $ 64,000, rather than $ 84,000 as provided in the original Eipper note, supports the inference that a $ 20,000 principal payment was made at some point. When questioned at trial, Ms. Biagi admitted that the $ 20,000 payment "must" have been made since the second note provided for a smaller principal amount. Petitioner's accounting records also support the inference that a $ 20,000 principal reduction occurred. For example, petitioner's personal net worth statement indicates that the principal amount of the mortgage on petitioner's residence as of September 31, 1981, was $ 64,000. There is some evidence, though weak, that supports petitioner's contention that neither a principal payment of $ 20,000 nor an interest payment of $ 1,440 was ever made. For example, no record of *388 either payment appears in petitioner's accounting records or in his bank statements. Petitioner did not deduct in 1980 or 1981 the $ 1,440 in interest purportedly paid by him in accordance with the Eipper note. More importantly, in this case there is no evidence, other than the provision of the Eipper note itself, that indicates that petitioner made the required principal and interest payments prior to the close of his 1980 tax year and some of the evidence supports a contrary conclusion. For example, petitioner's final $ 650 payment was actually made on January 7, 1981, after the close of his 1980 tax year. This payment was also required by the Eipper note to be made on December 26, 1980. In effect, respondent asks us to assume, without any proof, that petitioner would make interest and principal payments totaling $ 21,440 on December 26, 1980, prior to the close of his 1980 tax year, yet wait until after the close of such year to make a monthly payment which was due on the exact same date. Although we have doubts as to the accuracy of petitioner's accounting records, his personal net worth statement indicates that the principal amount of the mortgage on his residence remained *389 at $ 84,000 as of March 31, 1981. Under these circumstances, we conclude that respondent has failed to prove that principal or interest payments required by the Eipper note were paid prior to the close of petitioner's 1980 tax year rather than at the beginning of his 1981 tax year. Because the removal of such payments from the outflow side of petitioner's 1980 T account reduces the imbalance well below 25 percent of petitioner's reported 1980 gross income, we conclude that respondent has failed to prove the applicability of the 6-year period of limitations for petitioner's 1980 tax year. Petitioner next claims that respondent erred in failing to adjust the T account analysis to take into account the effects of inventory on costs of goods sold. According to petitioner, if a taxpayer, who has $ 10,000 in inventory on hand at the beginning of the year, sells all such inventory during the year for $ 10,000 and buys no further inventory during the year, respondent's T account analysis will charge such taxpayer with $ 10,000 in net income for such year. According to petitioner, this is so even though, after taking into account his beginning inventory as costs of goods sold, the taxpayer *390 should have no net income for the year. Petitioner's argument in this respect stems from his basic misunderstanding of the T account analysis. The T account, or cash expenditures, method of income reconstruction is not an accounting system. Under the T account method, inventory is irrelevant except to the extent it is sold for cash (in which case the cash generated will be inflow) or purchased for cash (in which case the cash expended will be outflow) during the tax year in question. The T account analysis concentrates on total outflow of cash, as opposed to inflow, to determine if the taxpayer spent more cash than he took in. Petzoldt v. Commissioner, 92 T.C. at 694.Thus, even if the taxpayer had $ 1,000,000 in gross receipts during the tax year under investigation from the sale of inventory purchased during a prior tax year, he would not be charged with unreported income unless he also purchased inventory (or had other expenses) for an amount in excess of $ 1,000,000 during the tax year under investigation. We, therefore, find no error in respondent's failure *391 to adjust his T account analyses to take into account inventory on hand at the beginning of petitioner's tax year. Petitioner's final argument is that respondent erred in failing to verify, through the use of another indirect method of income reconstruction, the amounts of unreported income revealed by his T account analyses. We disagree. Where a taxpayer fails to maintain adequate books and records which clearly reflect income, respondent is authorized to reconstruct a taxpayer's income under any reasonable method which does clearly reflect the full amount of income received. Section 446; Petzoldt v. Commissioner, supra at 687.Here, petitioner obviously failed to maintain adequate books and records. He, as well as Ms. Biagi, admitted as much at trial. Furthermore, the T account, or cash expenditures, method has been accepted on numerous occasions as a reasonable method by which respondent may reconstruct a taxpayer's income. Taglianetti v. United States, 398 F.2d 558 (1st Cir. 1968), affd. 394 U.S. 316 (1969); Petzoldt v. Commissioner, supra.
Petitioner points out that section 643.71 of the Internal *392 Revenue Manual suggests that an agent may use one of the other indirect methods of income reconstruction to reinforce his or her position that there is unreported income. However, such verification is a mere suggestion, not a requirement. In fact, it is well settled that respondent is not required to recompute a taxpayer's income under every available means. Webb v. Commissioner, 394 F.2d 366, 373 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. We, therefore, reject petitioner's suggestion that respondent must always cross-check his T account calculations under other indirect methods of reconstruction. In summary, we conclude that respondent has failed to prove that petitioner, in 1980, omitted from gross income an amount which is in excess of 25 percent of the amount of gross income stated on his 1980 return. Therefore, the 6-year period of limitations is inapplicable to petitioner's 1980 tax year and respondent's notice of deficiency was untimely with respect to such year. However, with respect to petitioner's 1981 tax year, we conclude that respondent has proven, through his T account computations and other supporting evidence, that petitioner *393 omitted in 1981 an amount in excess of 25 percent of the gross income stated on his 1981 return. The 6-year period of limitations thus applies to petitioner's 1981 tax year and respondent's notice of deficiency was timely. Once respondent has met his burden of proving that the deficiency notice was timely, the taxpayer bears the burden of proving that the deficiency and additions to tax determined therein are incorrect. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Petitioner has presented no evidence to indicate that respondent's 1981 deficiency determination is incorrect. In fact, from this record, we find that the evidence fully supports respondent's calculations. Nor has petitioner contested the section 6653(a)(1) and section 6653(a)(2) additions to tax for negligence or intentional disregard of the rules and regulations determined by respondent with respect to petitioner's 1981 tax year. We, therefore, sustain respondent on this issue also. Decision will be entered under Rule 155. Footnotes
*. For returns required to be filed after December 31, 1981, if the penalty under section 6653(a) applies, the penalty under section 6653(a)(2) will also apply in an amount to be determined.↩
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩